## Jett, et al. v. Jett.

(Decided October 18, 1916.)

### Appeal from Bracken Circuit Court.

1. Estoppel—Grounds of—Delay in Instituting Action.—Where one merely delays the bringing of her action beyond the time within which the person against whom she brings it could have sued her husband for slander, she is not estopped to maintain the action, even though her motive in delaying it was to let limitation run on the other cause of action.

2. Estoppel—Grounds of—When Delay Not Ratification.—Mere delay by the wife in suing to recover her money obtained from her husband by fraud or duress and without her consent, does not become a ratification of the payment so as to estop her to recover.

3. Equity—Laches—Delay in Bringing Action.—One is not guilty of laches in waiting shortly more than a year to bring an action which she had five years to bring before barred by limitation.

4. Appeal and Error—Review—Verdict on Conflicting Evidence.— Where the evidence is contradictory in character it is the province of the jury to determine the truth of the matter, and if done under proper instructions their verdict must be accepted as decisive of the issues of fact.

5. Husband and Wife—Commingling of Funds—Rights of Others.— Where a wife permits her husband to commingle her money with his, checking upon it at will, others to whom he may pay it in satisfaction of legal liabilities cannot be made to account to her if the payment be voluntarily made.

6. Husband and Wife—Right of Wife to Recover Her Money Paid to Others by Her Husband Under Duress.—Upon identifying it as her property, a wife may recover money of hers paid by her husband to others as the result of fraud or duress; the fact that her money was with her consent commingled in bank with his not affecting her right to recover.

7. Husband and Wife—Actions—Instructions.—In an action by the wife to recover money of hers obtained by others from her husband by fraud or duress, instructions examined and held to have properly advised the jury as to the law of the case.

W. A. BYRON, A. D. COLE, R. C. TALBOT and R. B. FRANK-LIN for appellants.

M. HARGETT and DUKE KINNY for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This action seems to have had its inception in a disagreement between R. C. Jett and Thomas

D. Jett, brothers, arising out of a proposal by Thomas D. Jett to their mother that she leave her own home and reside at a hotel in Brooksville, kept by himself and his wife, the appellant, Etna Jett, which proposal was strongly opposed by R. C. Jett. The breach between the brothers finally culminated in a charge by Thomas D. Jett and his wife, Etna Jett, that R. C. Jett had maliciously spoken and published of and concerning Etna Jett certain false and slanderous words affecting her character for chastity, which, because of their indecency, are not here reproduced. Etna Jett employed the appellant, W. A. Byron, a lawyer of prominence, living in Brooksville, to institute against R. C. Jett an action to recover the damages claimed by her on account of the alleged slander. Mr. Byron prepared the petition and placed it in the hands of the circuit court clerk of Bracken county with an order that it be not filed unless later directed by him, he preferring, as he claimed, to get the matter settled satisfactorily to the parties without a suit. Shortly after leaving the petition with the circuit court clerk, Byron had two interviews with R. C. Jett. In the first the latter denied the speaking of slanderous words concerning the appellant, Etna Jett, attributed to him, and at the instance of Byron signed a written statement prepared by the latter, containing such denial and expressing belief in the excellence of her character. The writing was witnessed by George W. Jett, a cousin of the parties concerned, and is as follows:

"Brooksville, Kentucky, April 4, 1913.

"To Whom It May Concern:

"I have known Etna Jett for years. Her husband is my brother and we always got along well. I believe Etna Jett is as modest and pure a woman as there is in the State of Kentucky. I never said a wrong word about Etna Jett in my life. So far as I know, she is as pure and good a woman as there is on earth. I never said that I had intercourse with her or that I knew as much about her as I did about my own wife. I make this statement freely and voluntarily, because it is true.

"Attest: G. W. Jett,

"Signed, R. C. Jett."

In the second interview between R. C. Jett and Byron the former, in settlement of the claim of Etna Jett

against him for damages on account of the alleged slander, executed and delivered to Byron his check on the First National Bank of Brooksville for $1,250.00, payable to Byron, who at once presented it at the bank and obtained thereon the money. Either at that meeting or the first one Byron gave R. C. Jett the following writing:

"To Whom It May Concern: Etna Jett and R. C. Jett having gotten into some trouble and having settled same satisfactorily to both parties, I hereby promise the said R. C. Jett, in consideration of said settlement that the said Etna Jett will not file any suit against him but will drop the matter so far as she and her husband is concerned.

"Signed, W. A. Byron,
"Attorney for Etna Jett."

The present action was brought by Viola Jett, wife of R. C. Jett, against the appellants, Etna Jett, her husband, Thomas D. Jett, and W. A. Byron, seeking to recover of them the $1,250.00 paid them in the check for that amount delivered to W. A. Byron by R. C. Jett; it being averred in the petition that the payment in question was made with money belonging to her and obtained from her husband, R. C. Jett, by threats and duress, made and exercised upon him by the appellants at the time of their receiving from R. C. Jett the check therefor. The answer of the appellants, which was joint and several, specifically denied the averments of the petition. The trial resulted in a verdict in favor of the appellee, Viola Jett, and against the appellants, Etna Jett and W. A. Byron, for $984.55, with interest thereon at the rate of six per cent. per annum from the 14th day of April, 1913, until paid. From the judgment entered upon that verdict the latter have appealed.

Appellants first complain that the trial court erred in refusing to permit them to file an amended answer which they tendered and asked leave to file at the conclusion of all the evidence and before the submission of the case to the jury. The amended answer, in substance, alleged that although the appellee, Viola Jett, was advised three weeks after its delivery of the giving of the check of $1,250.00 by her husband, R. C. Jett, to the appellant, W. A. Byron, in settlement of the appellant Etna Jett's claim against him for damages for the slander, by refraining from bringing the present action

against the appellants to recover the amount of the check until more than a year after the publication by R. C. Jett of the slander, she caused the right of action of Etna Jett against R. C. Jett for the slander to be barred by the statute of limitations of one year, and by such delay and alleged laches was estopped to maintain her action against the appellants.

We find no error in the trial court's rejection of the amended answer. If the $1,250.00 paid the appellant Byron by R. C. Jett was, in fact, the money of his wife, the appellee Viola Jett, and the payment thereof was obtained from him through the fraud of the appellants or by their subjecting him to duress, in such event she had five years from her discovery of such fraud or duress and not later than ten years succeeding the date of its perpetration, within which to sue for the recovery of the money. Ky. Statutes, sections 2515-2519. Appellee's right of action was in no way affected by the slander, if any, uttered by her husband against Etna Jett, consequently the fact that the action was brought after the expiration of the year within which Etna Jett should or might have sued R. C. Jett for the alleged slander, even if her motive for the delay was to enable Etna Jett's right of action against R. C. Jett for the slander to become barred by the statute of limitations, could not constitute an estoppel to her right to recover of appellants in this case; if, as alleged in the petition, the money belonging to her was wrongfully obtained from her husband through the duress charged. Reduced to its final analysis, appellants' attempted defense of estoppel set up by the amended answer rests upon the theory that they have obtained some sort of right to the money in controversy because of appellee's alleged laches in failing to assert her claim to it in such time as would have enabled Etna Jett, in the event of appellee's claim proving superior to hers, to institute an action of damages against R. C. Jett for the slander.

There is such a thing as "Estoppel by Conduct," but it arises only where the person against whom the estoppel is pleaded, by his conduct induces the person relying upon the estoppel to believe in the existence of a particular state of facts and to act thereon to his prejudice; but in such case the estoppel can go no farther than to prevent the former from denying that such state of facts does, in truth, exist. There may also be an "Estoppel

by Laches," that is a neglect to do something which one
should do, or to seek to enforce a right at a proper time.
It is likewise true that active negligence may operate
as an estoppel, but negligence, to amount to an estoppel,
must be in the transaction itself and the proximate cause
of leading the party in whose behalf the right to rely
upon it arises, into mistakes.   The term "estoppel in
pais" includes the forms of estoppel mentioned and all
others not arising from a record, deed or written con-
tract.  These forms of estoppel are customarily discussed
in the text books under the term "equitable estoppel,"
which was originally borrowed from equity, but, as said
in Fitzpatrick v. Baker, 155 Ky. 175, quoting with ap-
proval from 16 Cyc. 682:

"Equitable estoppels are so called not, however, be-
cause they are recognized as peculiar to equitable tri-
bunals, but because they arise upon facts which render
their application in the protection of rights equitable
and just.  The doctrine is recognized in the courts of
common law just as much as in the courts of equity, al-
though it was first administered as a branch of equitable
jurisprudence."

In Pomeroy's Equity Jurisprudence, vol. 2, section
804, an equitable estoppel is thus defined:

' "An equitable estoppel is the effect of the voluntary
conduct of a party whereby he is absolutely precluded
both at common law and in equity from asserting rights,
which might perhaps have otherwise existed, either of
property or contract, or of remedy, as against another
person who has in good faith relied upon such conduct
and has been led thereby to change his position for the
worse and who, on his part, acquires some corresponding
right, either of property or contract or of remedy."

It was not alleged in the amended answer that ap-
pellee was present or a party to the transaction in which
W. A. Byron obtained from R. C. Jett the check for
$1,250.00 in the alleged settlement of the appellant Etna
Jett's claim of damages for the slander; or that by any
act of appellee's occurring before or after the alleged
settlement appellants were induced to accept the check
or retain its proceeds, or that she said or did anything
in ratification of such payment, but only that by reason
of her failure to sue appellants as soon as she might
have done and within a year of the publication by R. C.
Jett of the slander against Etna Jett, the latter was

lulled into the belief that appellee did not object to the payment of the $1,250.00, and by reason thereof failed to sue R. C. Jett for the slander. It is apparent from what has been said that the alleged negligence of appellee in the particular mentioned cannot be said to have been the proximate cause of or inducement to appellants' acceptance of the check from R. C. Jett. Obviously the averments of the amended answer do not call for the application of any of the forms of estoppel mentioned above, hence the filing of the amendment was properly disallowed.

Appellants also complain of the trial court's refusal of an instruction peremptorily directing a verdict in their behalf, for which they asked at the conclusion of all the evidence. This contention will require consideration of the evidence. According to the testimony of R. C. Jett, the first interview between himself and W. A. Byron took place April 4, 1913, at the office of Mr. Byron, where he had gone on the latter's invitation. Shortly after he got to the office George W. Jett came in. Thereupon the witness related the following as the conversation that took place between himself and Mr. Byron:

"A. He told me that Tom Jett, my brother, and his wife were trying to get me into trouble and were talking of suing me for slander, for something I said about his wife. I said I thought that must be a false report. Mr. Byron and I talked on about the matter and while we were talking Mr. George Jett came in and in the course of the conversation Mr. Byron said: 'Will you sign a statement to that effect in the presence of George Jett?' and I said I would and Mr. Byron drew up a statement and I signed it and Mr. George Jett did—Mr. George Jett attested it. Q. Did you at that time tell Mr. Byron whether or not these statements were true that he was telling you about? A. I told him they were not true, and he said: 'Will you sign a statement to that effect in the presence of George Jett?' Q. Would you know that statement if you saw it? A. I think so."

The paper referred to by the witness is the one first copied in the opinion.

"Q. What did he say to you, if anything, after you signed the statement? A. I think we sat there and talked, and then Mr. Jett got up and went down, and after a while Mr. Byron handed me another piece of

paper and he said it is all settled now and there is nothing more to do. She will be satisfied and so will you. I came on down and went on down home and I never thought anything more about it.''

The witness also testified that upon leaving Byron's office shortly after signing the written statement above referred to, the latter handed him the second writing copied in the opinion, which he carried home with him. The witness' second interview with Mr. Byron was on the 14th day of April, 1913, and the following excerpts from his testimony will show his version of what accurred in that interview:

''How did you happen to see him (Byron) on that day and where did you see him? A. I was standing over in the Court House door and some boy came up to me and said Mr. Byron wanted to see me in his office. I went up there a few minutes afterwards, maybe it was a half hour. Q. When you got up there, what did he say to you? A. There were several in the office when I went up. It was county court day. Q. Who were they? A. Tom Jett and Howard Jett, and Paris, I think (Howard and Paris being sons of Tom) and several others. Q. Did they remain there? A. They stayed a while. Q. Then where did they go? A. Well, they were all talking in there and I started to go down stairs. Mr. Byron followed me out in the hallway and shut the door behind him and he said, 'Don't go away, I want to see you directly.' I stepped back in the room and sat down and stayed there until all went out and Mr. Byron and I was left to ourselves. Q. What did he say to you—when you and Mr. Byron were left to yourselves? A. He told me that they were not satisfied about the arrangements he and I had made in the settlement of the trouble that came up before. Q. You mean with reference to signing this paper the 4th of April? A. Yes, sir, he said they was not satisfied and they demanded an amount of money from me. Q. How much money did he tell you they wanted? A. He said $1,250, to satisfy her and himself. Q. Did he read any paper to you or show you a paper or petition of any kind? A. Yes, he read a lot of stuff to me. I don't remember just what it was. I was scared and I don't remember about it. Q. What did he say that paper stated he was going to do? A. He said if I didn't pay the amount they asked for they would sue me for $10,000, in a slander suit. Q. What else did he

say, if anything; did he say anything to you about fighting the suit? A. When I went into the office there was a crowd in there and I started out and Mr. Byron followed me and told me he wanted to see me and then I went back and Mr. Byron commenced talking to me, when the others went out, about this matter, and we talked about it a good while and I told him I didn't have no money to pay any amount like that and he said it will take that amount to satisfy them and no less. I told him I didn't have that amount of money to pay him and he said, well you can draw on the First National Bank, and I said, that was my wife's money, and he told me that I could satisfy her, to take it and not to tell her anything about it, to just draw that amount of money out of the bank. I said, I don't like to treat her that way, it is her money. Then he sat down and drew a check for $1,250 and I hesitated before signing it and I told him then it was my wife's money and I would rather not sign that check and he insisted I do it to satisfy him and Etna Jett, and he said, your life is in danger, and he said, if you don't sign that check you will be apt to be hurt and hurt badly, and he said, it was blood or money. I was scared and began crying and told him it was my wife's money. Then he said you had better sign this check and not be crying, it is a matter that had got to be straightened up. Then he got up from the table, and he said, you had better sign that check, and I did sign it, and Mr. Byron took the check and put it in his pocket and then told me I could go home and I went on down home. Q. At that time did Mr. Byron, in that conversation, say to you who would hurt you or speak about anybody being in town? A. He said there was a bunch there that would kill me, and he might himself. Those are just exactly the words he used to me. He said he didn't know but what he might do it himself and he scared me into signing that check. Q. Previous to the time Mr. Byron called you up in the office, had you heard anything about this matter; for instance, at the Germantown Fair, had you heard anything about it? . . . Did you have any trouble at the Germantown Fair about this matter, the fall before, and if so, with whom? A. Yes, sir, Jim Walker got after me up there. A. Who is Jim Walker? A. Who is he? My brother's father-in-law. Q. What did he do? A. He threatened to kill me and I had to leave. . . . I was standing talking to someone and

he ran up and grabbed me, tore my coat and held a knife on me. . . ."

"Q. I didn't understand just what he (Byron) said to you when you began to cry and told him that it was your wife's money, what did he say to you then? A. He told me I had better sign that check, that my life was in danger at any time. After I signed the check I went on down the stairway between the two buildings and when I got down Howard Jett was standing there with his hands in his pocket. I went on down past him and he ran up in Mr. Byron's office. Q. While you were in Mr. Byron's office were any of the other parties, that is the Jetts, passing through the office? A. They were passing through all the time. Howard Jett would come popping in and Mr. Byron would go and talk to him; he would open the door and look in and Mr. Byron would go out and talk to him and then come back and talk to me. Q. Did you give Mr. Byron this check for $1,250 because you were afraid not to? A. Yes, sir.''

George W. Jett testified that he was present in Byron's office when the paper containing R. C. Jett's denial of having spoken of the appellant Etna Jett the slanderous words charged was signed by R. C. Jett, and that at the request of Byron he attested it as a witness; and that he left Byron's office before the departure therefrom of R. C. Jett. He only heard the denial of R. C. Jett as to the speaking of the words, and the expression of his willingness to sign the paper when Byron suggested that he do so, and did not see Byron hand R. C. Jett the second paper as the latter claimed Byron did in that interview. Upon being recalled, the witness testified that he was at the Germantown Fair the previous fall and present when Walker, the father of the appellant Etna Jett, made the attack on R. C. Jett with a knife, and that Walker then gave as a reason for the attack that Jett had slandered his daughter, Etna.

W. A. Byron, in testifying in behalf of himself and the other appellants, denied that he sent for R. C. Jett to come to his office at the time of either of the interviews between them, and stated that the latter came to see him upon each occasion of his own volition and solicited his assistance in procuring a settlement of his trouble with the appellant Etna Jett and her family, growing out of the alleged slander of her by him; that the offer of settlement first came from R. C. Jett, who

expressed his willingness to pay $1,250.00 to prevent the institution of a suit by Etna Jett against him for the slander; that he (Byron) neither threatened R. C. Jett nor represented that there was any danger to his life from Etna Jett's family or others if he refused to pay the $1,250.00 to effect such settlement; that he was never advised by R. C. Jett that the check he received from the latter in settlement of the slander suit was drawn upon money belonging to his wife, nor was he then otherwise informed of her ownership thereof. Byron further testified that the delivery to him by R. C. Jett of the check of $1,250.00 in settlement of the claim of Etna Jett for damages growing out of the slander did not result from any fraud or duress practiced or exercised by him upon R. C. Jett, but was his voluntary act; that the second paper, copied in the opinion, was not given by him to R. C. Jett in the first interview they had, but in the second, and following the delivery of the check to him by the latter; and that though this writing is undated and makes no mention of the sum or any amount received from R. C. Jett in the settlement, it was, nevertheless, intended and given as a receipt for the $1,250.00 paid by R. C. Jett, as well as to show the compromise and settlement of the claim of Etna Jett for the damages resulting to her from the slander.

It is apparent from what has been said of the testimony of R. C. Jett and W. A. Byron, the only persons present throughout each of the two interviews and also the only participants therein, that they flatly and specifically contradict each other at every material point. This being true, it was peculiarly the province of the jury to determine from the testimony furnished by them and the circumstances attending the transactions between them, whether the check of $1,250.00 was obtained from R. C. Jett by fraud or duress. The finding of the jury that it was obtained by duress, in view of the contradictory character of the evidence, must be accepted as decisive of that issue. The fact that the trial court or this court, if required to try the issue of fact, might have been inclined to a different conclusion, would not authorize the interference of either with the verdict.

There was, however, yet another issue of fact raised by the pleadings as material to the correct decision of the case as was that of duress, viz.: the question whether the appellee was in fact the owner of the fund or money

upon which the check given by R. C. Jett to the appellants was drawn. If the money was not hers, the fact that it was obtained from her husband by duress would not entitle her to recover it. If the husband was the owner of the money and it was obtained from him by duress, he alone could maintain an action for its recovery.

Notwithstanding the issue of fact made by the denial in appellant's answer of appellee's ownership of the money received by W. A. Byron for his clients on the check he obtained from R. C. Jett, there was no contrariety of evidence as to the fact that at the time the check was given and when it was cashed, she had on deposit in the bank on which it was drawn $1,500.00, for R. C. Jett so testified, without contradiction. It is true that this amount, together with $265.45 belonging to him, was, as he testified, deposited in his name and appeared on the books of the bank to his credit, and that the $1,500.00 belonging to his wife, the appellee Viola Jett, was made up of sums received as rents or realized from the sale of products on and from a farm of one hundred acres of land lying in Pendleton county, to which she held the exclusive title. He identified and pointed out on his bank or pass book various items of money deposited from time to time, aggregating $1,601.45, which he said were realized from the wife's farm in the fall of 1912 or winter of 1913. The pass book was introduced in evidence. The witness further testified that from the time of his marriage to the appellee Viola Jett, about 1907, down to the time of giving his testimony in this case, it had been his custom to collect moneys due his wife and when received to deposit such collections to his credit in bank; that he had been able all the while to identify and indicate what deposits appearing on his pass book were of money belonging to him individually and what belonged to his wife, and to account to her for same when demanded; that this custom of depositing her money to his individual account was all the time known and assented to by her and that each of them was accustomed to check upon his account as desired.

George Poage, cashier of the First National Bank of Brooksville, being introduced by appellee, testified that he had been the cashier of that bank for about eight years and was familiar with the account kept by R. C. Jett therein; also that he knew that a part of the money kept

on deposit in his bank to the account of R. C. Jett belonged to his wife, the appellee Viola Jett, but he did not know what part of it was hers. He further testified that appellee claimed to be the owner of a part of the money on deposit in his bank in her husband's name on April 14, 1913, but did not undertake to indicate the amount. He also knew that for seven or eight years it had been the custom both of appellee and R. C. Jett to check upon the money deposited to the latter's account at will, and that such checks as were drawn on the account by appellee were signed "Mrs. R. C. Jett."

As previously intimated, the testimony of R. C. Jett and George Poage with respect to appellee's ownership of the fund upon which the check received by appellants from R. C. Jett was drawn, was not contradicted by appellants or any witness introduced in their behalf. It is their contention, however, that appellee, by thus permitting her husband to deposit and commingle her money with his own and check upon it at will made him her trustee or agent, and such trusteeship clothed him with unlimited power to appropriate the same to the payment of his debts or to make such other disposition of it as he might choose; and that while he may be made to account to her for its misappropriation, others to whom he may have paid it in satisfaction of a legal liability resting upon him cannot be made to account to her therefor. This contention would be sound if the payment of appellee's money to appellants here complained of had been voluntarily made by R. C. Jett. But as, according to the cause of action stated in the petition and the finding of the jury based upon the evidence as to the transaction, the payment was not so made, but resulted from duress of which he was the victim, appellee has the right, upon identifying the money so paid as her property, to recover it of those by whom it was wrongfully received. Under the issues presented by the pleadings, the matter to be determined by the jury was not whether in appropriating appellee's money, which he held in trust or as agent for her, to the discharge of a liability imposed upon him by law, R. C. Jett acted by virtue of authority conferred by her or within the apparent scope of such authority, but to determine from the evidence before them whether appellee was the owner of the money paid by R. C. Jett to appellants, and if so, whether it was obtained as the result of duress exercised

upon him by appellants. While the jury did not find appellee to be the owner of the entire $1,250.00 contained in the check, appellants obtained from R. C. Jett, they seem to have been convinced, as appears from their verdict, that $984.55 thereof was her money, and the fact that the verdict awarded her this $984.55 indicates that they were further convinced that the payment made by R. C. Jett to appellants was obtained by the latter in the wrongful manner complained of in the petition. The effect of this finding was not that the remainder of the $1,250.00 received by appellants from R. C. Jett, viz.: $265.45, was rightfully obtained by them, but only that as in their view of the evidence such remainder did not belong to appellee, she was not entitled to recover it.

It is patent from what has been said of the issues and evidence that the refusal of the peremptory instruction asked by appellant was not error.

The trial court gave only three instructions. By the first the jury were told, in substance, that if they believed from the evidence that the appellants Etna Jett and W. A. Byron, either or both of them, by threats or violence, by duress or by putting him in fear, induced or compelled R. C. Jett to sign and deliver to W. A. Byron the check of $1,250.00 and that Byron received from the bank the money thereon, and should further believe from the evidence that the money was the property of the appellee, Viola Jett, they should find for her and against Etna Jett and W. A. Byron in the sum of $1,250.00, the amount prayed for in the petition, with interest at six per cent. from April 14, 1913, until paid, and unless the jury so believed from the evidence they should find for appellants.

By the second instruction the jury were further told that if they believed from the evidence that W. A. Byron and Etna Jett obtained from R. C. Jett the money sued for in the manner described in instruction No. 1, and further believed from the evidence that the money or any part thereof was the money of the appellee, then they should find for her in an amount equal to so much of the fund as they might believe from the evidence, if any, was the money of appellee, not exceeding $1,250.00, with interest at six per cent. from April 14, 1913, until paid. The third instruction properly defined the term "duress."

The instructions were all objected to by appellants, but we think the objections without merit. The converse of instruction No. 1 might with propriety have been given, but in view of the fact that after predicating the state of case which, if believed by the jury from the evidence, would authorize a verdict for appellee, it concludes with the words, "and unless the jury so believe from the evidence they will find for defendants," it is our conclusion that the failure of the court to give the converse of the instruction was not error. Besides, such an instruction was not asked by appellants.

Appellants strongly complain of the refusal of the court to give instruction "C," asked by them. This instruction would have submitted to the jury the effect of the commingling of the funds of appellee and her husband, R. C. Jett, in the First National Bank of Brooksville in the name of R. C. Jett and told them that if it was their custom, recognized by the bank, for each of them to write checks at pleasure in his or her name against the deposit for their individual purposes, and further that R. C. Jett gave to W. A. Byron the check for $1,250.00 against such deposit in the bank in pursuance of such usage, they should in that event find that the deposit so checked against was not a trust fund and return a verdict for the appellants. The instruction would have been misleading, for whether the deposit constituted a trust fund or not, if appellee owned any part of it and the check delivered by R. C. Jett to appellants was obtained by duress exercised upon him by them, appellee would have been entitled to recover so much of the money they obtained on the check as belonged to her. As a whole the instructions correctly gave the jury all the law that was applicable to the issues involved.

Appellants' complaint of the exclusion by the trial court of the evidence offered by them to prove the slanderous words it was claimed R. C. Jett spoke of the appellant Etna Jett, we regard without merit. The facts that she claimed to have been slandered by R. C. Jett and that others would have testified that they heard him utter the slander, were admitted of record by appellee. It would have been a diversion from the issues involved in the instant case to have admitted evidence as to R. C. Jett's guilt or innocence of the slander. Such evidence could in no way affect the rights of the appellee. How-

ever just a demand appellants may have had against R. C. Jett, it gave her no right to take from him by duress the money of appellee in satisfaction of such demand.

Our reading of the record discloses no sufficient cause for reversing the judgment appealed from. Hence, it must be and is affirmed.